1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,    )
                                 )    Case No. 2:16-cr-198-JCM-VCF
4            Plaintiff,          )
                                 )    Las Vegas, Nevada
5        vs.                     )    December 13, 2016
                                 )    10:00 a.m.
6   MICHAEL STEVEN SANDFORD,     )
                                 )    Sentencing
7            Defendant.          )
    _____ )

8                     TRANSCRIPT OF PROCEEDINGS
9             BEFORE THE HONORABLE JAMES C. MAHAN
               UNITED STATES DISTRICT COURT JUDGE
10

11  APPEARANCES:

12  For the Government:

13          DANIEL SCHIESS
            Assistant U.S. Attorney
14          District of Nevada
            501 Las Vegas Boulevard South, Suite 1100
15          Las Vegas, Nevada 89101

16  For the Defendant:

17          BRENDA WEKSLER
            RYAN NORWOOD
18          Assistant Federal Defenders
            411 East Bonneville Avenue, Suite 250
19          Las Vegas, Nevada 89101

20

    Also present:  Brian Blevins, US Probation
21

22

23

    Court Reporter:  Katherine Eismann, CSR, CRR, RDR
24                   (702)431-1919 eismann.csr@gmail.com

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

1          (Tuesday, December 13, 2016, 10:00 a.m.)

2                         --oOo--

3                  P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  This is the time set for

5    the imposition of sentence of Michael Steven Sandford, Criminal

6    Case No. 2:16-cr-198-JCM-VCF, United States of America versus

7    Michael Steven Sandford.

8          Counsel, please note your appearance for the record.

9          THE COURT:  Mr. Schiess.

10         MR. SCHIESS:  Thank you, Your Honor.  I'm appearing

11   on behalf of Jared Grimmer who's unavailable today.

12         THE COURT:  All right.

13         MR. SCHIESS:  The case will remain assigned to him.

14         THE COURT:  All right.  Thank you.

15         Miss Weksler.

16         MS. WEKSLER:  Good morning, Your Honor.  Brenda

17   Weksler appearing on behalf of Mr. Sandford who is present and

18   in custody.

19         THE COURT:  All right.  And Mr. Blevins here from

20   probation.

21         All right.  Any reason why sentence should not be

22   imposed at this time?

23         MR. SCHIESS:  No, Your Honor.

24         MS. WEKSLER:  No, Your Honor.

25         THE COURT:  All right.  Miss Weksler, let me ask you

1    and Mr. Sandford to approach the lectern, please.  I need each

2    one of you by a microphone.  And you as well as, if you want,

3    Mr. Norwood.

4            All right.  Mr. Sandford, this is the time set for

5    imposition of sentence upon you in Case No. CR-S-2:16-cr-198.

6            On September 13, 2016, you appeared before the Court

7    and entered a plea of guilty to Count Three, being an illegal

8    alien in possession of a firearm, which is a violation of 18,

9    USC, Section 22 -- Section 922(g)(5) and 924(a)(2), and Count

10   Three, impeding and disrupting government business and official

11   functions, which is a violation of 18, USC, Section 1752(a)(2)

12   and (b)(1)(A).

13           Having reviewed the presentence report and the plea

14   agreement, the Court hereby accepts your guilty plea and

15   adjudicates you guilty of this charge.

16           And one objection was filed, and that's been

17   resolved.  Is that correct?

18           MR. SCHIESS:  Yes.

19           THE COURT:  All right.  And it pertained to the exact

20   name of the gun range Mr. Sandford utilized the day before the

21   commission of the instant offense.

22           All right, Miss Weksler.  Do you have any objection

23   to the report?

24           MS. WEKSLER:  We do not, Your Honor.

25           THE COURT:  All right.  Mr. Sandford, did you read

1   the presentence report?

2             THE DEFENDANT:  Yes, I did, Your Honor.

3             THE COURT:  Did you discuss it with your attorney?

4             THE DEFENDANT:  Yes, Your Honor.

5             THE COURT:  Did you find any errors or discrepancies

6   in the report?

7             THE DEFENDANT:  No, I did not, Your Honor.

8             THE COURT:  All right.  Probation calculated the base

9   offense level to be 14.  Four levels were added because the

10  defendant used or possessed a firearm or ammunition in

11  connection with another felony offense or possessed or

12  transferred a firearm or ammunition with knowledge, intent, or

13  reason to believe that it would be used or possessed in

14  connection with another felony offense.

15            So pursuant to Sentencing Guideline Section

16  2K2.1(b)(6)(B), that results in an adjusted offense level of

17  18.  A three level reduction for acceptance of responsibility

18  was applied, resulting in a total offense level of 15.  The

19  total criminal history points are zero, resulting in a Criminal

20  History Category of Roman Numeral I.

21            For Counts Two and Three, the maximum statutory term

22  of imprisonment is 10 years, and the maximum statutory fine is

23  $250,000.  And a special assessment of $100 per count is

24  mandatory.

25            Based on a total offense level of 15 and a Criminal

1   History Category of Roman Numeral I, the guideline range would

2   be 18 to 24 months, with a supervised release term of one to

3   three years, and the guideline fine range of $7,500 to $75,000.

4           All right.  Mr. Schiess, any additional comments

5   before I impose sentence?

6           MR. SCHIESS:  Yes, Your Honor.

7           Your Honor, the defense has filed a motion asking the

8   Court to be lenient on the defendant based upon the sentence,

9   and the probation office has recommended a year and a day.

10          The sentencing guideline range, as you know, is 12 to

11  18 months.  Our position is, is that in terms of balancing the

12  factors under 3553, that a sentence within the range would be

13  appropriate.

14          Now, I appreciate and I'm very sympathetic to

15  Mr. Sandford's mental issues that are affecting him and the

16  longevity of it.  But I'm also very concerned about the danger

17  that he poses to society which is a factor under 3553.  And I

18  believe that the concern that we have there is merited.

19          And you have the pleadings that we have showing that

20  he has, by his admission, planned to carry out this criminal

21  activity for over a year.  He thought about using a gun, then a

22  knife, and then -- I mean a rifle, then a knife, and then the

23  handgun.

24          But what's troubling about that is not merely the

25  planning that went into it, but his statement was that if he

1   was unsuccessful, he would have gone to Arizona to

2   President Elect Trump's next rally and then tried to carry it

3   out there.

4           Now my saying to -- that to the Court is that looking

5   now, taking that circumstance into the context, here we have

6   the defendant who's been treated now for the first time with

7   medication just recently.  And we have a person who needs to --

8   in my layman's terms, but reading it in Dr. Roitman's report,

9   he needs to stay on medication for a long time.

10          And what's going to happen here is if the Court

11  follows the probation's recommendation and gives him a year and

12  a day, and then you subtract time served, minus good time, he's

13  going to be out in -- probably not eligible for halfway house

14  given his immigration status.  He's going to be out in four

15  months.

16          My concern is -- and then once he's out in four

17  months, he's going to be into ICE custody and then most likely

18  immediately deported.  When he's deported to England, there's

19  no criminal justice matter or procedure that's going to make

20  sure that he gets mental health treatment.

21          And so then the question -- and so we can't predict

22  what the crystal ball says is going to happen in England.  We

23  can only deal with what's in front of us.

24          So my concern is, is that to protect the community,

25  that we make sure that Mr. Sandford gets counseling for a

1   sufficient period of time and mental health observation and

2   medication for a sufficient period of time to make sure that it

3   becomes, in one sense, a habit; two, that he's willing to stay

4   on the medication so that he's in self-control of using what it

5   takes to avoid the issues that he has.

6           Without being an expert, it just seems to me that

7   given the longevity of his problem, which essentially has been

8   increasing over a lifetime but particularly in the last four

9   years, that four months isn't enough to really feel comfortable

10  for the community.

11          So a recommendation is that if you fashion a sentence

12  for 18 months, give him the six months' time served, that

13  leaves a year.  Take off about two and half months for good

14  time, that still will give him probably about 10 months left to

15  serve.

16          And with the power of the Court, that seems to me to

17  be a period of time sufficient for Bureau of Prisons to be able

18  to say "Is this working for him," so that we can protect not

19  only the people here but, you know, in the country where he's

20  going.

21          THE COURT:  But my understanding of time off for good

22  time, which he'd be eligible for, 12 months and a day, would be

23  54 days.

24          MR. SCHIESS:  Which is almost two months.

25          THE COURT:  That's 10 months.

1        MR. SCHIESS:  Two months.  So --

2        THE COURT:  But I mean, so he would be serving 10

3   months.  A sentence of 12 months and a day, he'd be serving 10

4   months.

5        MR. SCHIESS:  So he has only four -- I'm sorry to

6   interrupt you.  I apologize.

7        THE COURT:  No.  No.  No.  So that -- you said four

8   months.  My understanding is it would be 10 months.

9        MR. SCHIESS:  Then I may have misspoken.  If you

10  impose the sentence of a year and a day, he actually only has

11  to serve about 10 months, which means subtract six months from

12  that, he's left with four months to serve.  Which my --

13       THE COURT:  But why would he go to a halfway house

14  with just 10 months?

15       MR. SCHIESS:  Well, he probably can't.  Because of

16  his immigration status not be eligible for a halfway house.

17       THE COURT:  So, I mean, so it seems to me we are

18  looking at 10 months under -- under Miss Weksler's proposal.

19       MR. SCHIESS:  Four months left under her proposal.

20  And the question -- and he just went through Dr. Roitman's

21  assessment.  So he's recently been on medication --

22       THE COURT:  No, I understand.  I understand, and I

23  agree with what you're saying that -- that it seems to me that

24  Mr. Sandford has mental health issues which -- which need to be

25  addressed.

1             MR. SCHIESS:  And the question is can they be

2  sufficiently addressed to make sure he's going to be following

3  the regimen in four -- the remaining four months, or does the

4  Court need to have probation look at him or Bureau of Prisons

5  look at him for 10 months left.  Is 10 months better than four

6  months to be able to make sure that he's going to follow the

7  situation and not be a danger to the community.

8             THE COURT:  And I am just not understanding.  How is

9  it four months?

10             MR. SCHIESS:  Oh, well, if you give him a year and a

11  day --

12             THE COURT:  Uh-huh.  He'll get off -- good time,

13  he'll get out --

14             MR. SCHIESS:  He has 10 months left.

15             THE COURT:  -- 54 days off.  So it will be roughly 10

16  months.

17             MR. SCHIESS:  So 10 months, he's already served six,

18  so he would get credit for time served.

19             THE COURT:  Oh, I see what you're saying.  He's

20  already served six.  But he's been undergoing treatment during

21  the six months he's been incarcerated; has he not?

22             THE DEFENDANT:  Yes, sir.

23             MS. WEKSLER:  (Nods head.)

24             MR. SCHIESS:  I don't know it's been the entire six

25  months though.  I'd have to go back and look at the date

```
 1   Dr. Roitman's --
 2                THE COURT:  All right.
 3                MR. SCHIESS:  -- report is.  So that's my concern is,
 4   you know --
 5                THE COURT:  Okay.  All right.
 6                MR. SCHIESS:  -- if we do it a little bit longer than
 7   the four months remaining, then are we in a better position to
 8   better protect the community.
 9                THE COURT:  All right.
10                MR. SCHIESS:  Thank you.
11                THE COURT:  All right.
12                All right.  Mr. Sandford, would you like to address
13   the Court?  Would you like to have your attorney speak on your
14   behalf?  Or both of you may speak.  It's your option.
15                THE DEFENDANT:  Yes, both, please, if that's okay.  I
16   mean, I know that saying sorry is not enough, but I really do
17   feel awful about what I did.  I mean, I don't want to hurt
18   anyone.  I feel so bad about what I did.  And I just wish there
19   was some way that I could make things better.
20                I know that there's no way I can.  But I just feel
21   terrible and do -- to everyone involved.  I've taken up so much
22   time.  I've caused so many problems.  I've caused the taxpayers
23   so much money, and I just feel terrible about it.
24                THE COURT:  But you shouldn't feel terrible about it.
25   You know, people are concerned about you.
```

1              THE DEFENDANT:  Thank you, Your Honor.

2              THE COURT:  There's a positive side to that, that

3    people are concerned about you.  You understand?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  So I think part of your problem, maybe

6    you just feel alone.  But I hope this has brought home to you

7    that you are not alone.  That there's help out there, and

8    people are concerned about you.

9              THE DEFENDANT:  Thank you, Your Honor.  That means a

10   lot to me.  Thank you.

11             THE COURT:  Okay.

12             THE DEFENDANT:  And I'm just really sorry to you and

13   to the Court for taking up so much of your time.

14             THE COURT:  Well, that's why I get the big bucks,

15   Mr. Sandford.

16             MS. WEKSLER:  Judge, I think that the point that the

17   government makes are good points.  But as the Court has noted,

18   Mr. Sandford has been undergoing treatment since he's been

19   incarcerated.  And I think one of the good things about the

20   treatment is that Mr. Sandford now recognizes the difference.

21             The way that he looks at things has changed much

22   since he's been undergoing treatment.  And he's under

23   psychotropic drugs that allow him to make formed thoughts and

24   make decisions that before he would not have been able to.

25             I guess one of the things that I would like to

1   respond to in terms of government's argument is that

2   Mr. Sandford's going to face these concerns whether he's let

3   out in four months, nine months, 18 months.  The main thing

4   here is that he needs to continue undergoing treatment --

5            THE COURT:  Yes.

6            MS. WEKSLER:  -- as the Court noted.

7            THE COURT:  That's Mr. Schiess's point is that, you

8   know, he needs treatment.

9            MS. WEKSLER:  Correct.  But I think treatment is more

10  than just taking medication.  Treatment also requires or it

11  helps when you have the support of your family.

12           THE COURT:  Yeah.

13           MS. WEKSLER:  And his family is in England.  His

14  family is actually present in court today.  His mom is here,

15  his dad, his sister, and his grandmother.  And they are

16  incredibly supportive, and they care for him deeply.  And he's

17  going to have the kind of support system present with him in

18  England whenever this Court releases Michael.

19           So I think that the most important part of treatment

20  is the fact that you have that family support to care for you,

21  to ensure that you are taking your medications, to ensure that

22  you are seeing the psychiatrist that you need to be seeing.

23           And he has that in place.  He's very lucky to have

24  that in place.  A lot of my clients, and the Court has seen

25  many individuals in the past, do not have that support system

1   in place, which is what allows for those individuals to go back

2   into the community and unfortunately commit more crimes.

3   Michael is in a very different position, and he's lucky enough

4   to have that support with him.

5              So while I understand the government's concern, there

6   is enough of a support mechanism in place to make it somewhat

7   less likely that that will happen.

8              As far as the kind of planning that went into this,

9   Judge, I think that the report that Dr. Roitman prepared is

10  pretty accurate.  Mr. Blevins prepared a very thorough report

11  as well.

12             It's clear to me that while he made statements

13  indicating that he had been planning this for a year, the facts

14  sort of speak for themselves.

15             Mr. Sandford had been in the United States for over a

16  year by that point.  And President Trump had been campaigning

17  mostly in the East Coast at the beginning.  So if it's true

18  that he really wanted to accomplish this goal, he would have

19  started going to the rallies beforehand in the East Coast,

20  where he was at, scoping out the situation, trying to see what

21  kind of firearms he would be dealing with, if that was his plan

22  to truly disarm the security guard as Mr. Blevins described in

23  the PSI.

24             He would have been unable to do so, not to mention

25  the fact that you can see Mr. Sandford.  He is a very small

1  person, and his ability to actually wrestle with the security

2  guard would have been impossible.  He would have never been

3  able to actually accomplish this.

4         So while you do have him going into the firearm range

5  the day before, this is really not a plan.  This is mostly --

6  it's an act of following command hallucinations.  He's just

7  answering to voices that he's been hearing, unfortunately, for

8  a very long time.

9         So I guess what I'm trying to get to is this was not

10  truly an act of volition.  This was something that he was

11  responding to as a result of a very serious -- not just one,

12  but a variety of different mental health conditions that he's

13  been suffering from for a very long time.

14         THE COURT:  Well, let me cut -- I'm not going to cut

15  you off.

16         MS. WEKSLER:  That's okay.

17         THE COURT:  But I think the most important part is,

18  is that he recognizes -- you know, you recognize you need help.

19         THE DEFENDANT:  Yes, I do, Your Honor.

20         THE COURT:  You understand?  I mean, because if he

21  said, "I don't need help.  I'm great.  Nothing wrong with me,"

22  you know, that's -- that's the danger, you know, and -- because

23  then those forces take over your life.  You understand?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And as you know, that's what -- that's

1    what got you into trouble here.

2            Now, go ahead.  I -- you said the most important part

3    was family support.  I think that's important, but with someone

4    who needs mental health treatment, he's got to accept the

5    treatment and say, "Yeah, this is something I need just to keep

6    me going on an even keel so I can be a success in life."

7            Because there's no reason you can't be successful.

8    You've got the potential if you just apply yourself.

9            THE DEFENDANT:  Thank you, Your Honor.

10           THE COURT:  Now, go ahead.  I didn't mean to cut you

11   off.

12           MS. WEKSLER:  No, it's fine.  It's fine, Judge.

13           THE COURT:  But I wanted to give you a chance if you

14   want to respond to me or anything else.

15           MS. WEKSLER:  I will.  Yes, just very briefly.  I

16   want the Court to know that we have been meeting with Michael

17   very regularly just because we recognize that he's very young;

18   that he does not have family support.  He's never been in this

19   kind of an environment before.  This is the first time that

20   he's ever even been arrested for anything.  So we've been

21   meeting with Michael very regularly.

22           And one of the changes that I have observed in

23   Michael is that you can tell that he is -- he's much more

24   accepting of the fact that he needs treatment and medication

25   than he would have ever been at the beginning.  Right?

1          So, at the beginning, as he stated many, many times

2   to many different people, he was not really willing -- being a

3   willing participant in that respect.  And I think Michael

4   realizes that that lack of treatment, that lack of cooperation

5   in terms of cooperating with psychiatrists and doctors is what

6   got him into the kind of mess that he is in right now.

7          And that's something that we've seen evolve

8   throughout the months that we've been visiting Michael.  So I

9   did want the Court to know that.

10          THE COURT:  All right.  I mean, I can see he's

11   different from when he entered -- when he changed his plea.

12   What was that?  Three months ago.  You know, you look much more

13   at ease, much more at peace.

14          THE DEFENDANT:  Thank you, Your Honor.

15          MS. WEKSLER:  And his medication has increased since

16   then as well, Judge.  We've been following that with the

17   prison, with the -- with Pahrump that his medication has gone

18   up from 3 milligrams to 5 milligram since.

19          So, Judge, it's -- I think that the probation

20   department makes a really good case for what a fair sentence

21   should be in this case.

22          Mr. Sandford is eager to go home.  He wants to be

23   with his family.  He is very alone, very much in need of his

24   family, and his wishes are that the Court enter a sentence of

25   credit for time served.  That's what Michael would like the

1   Court to do.

2           I know that the Court has many things that it needs

3   to consider.  I do want to emphasize the fact that the

4   individuals that have spent the most time with Michael have

5   been, of course, counsel and Mr. Blevins, who spent a very long

6   period of time during the PSI interview and preparing the

7   report.

8           So with all of those things in mind, I just ask the

9   Court to -- to fashion a sentence that's fair in this case.

10          THE COURT:  All right.  Probation want to add

11  anything?

12          PROBATION OFFICER:  No.  Thank you, Your Honor.

13          THE COURT:  All right.  Because I think you did a

14  very complete report, a thorough report.

15          Now, Michael's mother, I got a handwritten note or

16  statement.  Did she want to testify?  Was that the --

17          MS. WEKSLER:  Judge, if the Court would like to hear

18  from Lynne, she's here.

19          THE COURT:  If she wants -- if she wants -- I'll make

20  the statement a part of the record, but if you want to speak, I

21  will give you a chance to speak as well.

22          MRS. SANDFORD:  I would like that, please, Your

23  Honor.

24          THE COURT:  All right.

25          MS. WEKSLER:  Judge, we appreciate that.

1          THE COURT:  Have a seat then and let me bring her

2     forward.  Just right up here by a microphone.  First of all,

3     give us your name, and then make your statement.

4          MRS. SANDFORD:  My name is Lynne Sandford.  I'm

5     Michael's mother.

6          (Off-the-record discussion between Ms. Weksler and

7     Mrs. Sandford.)

8          MRS. SANDFORD:  I'm Michael's mother, and he means

9     everything to me.  He means everything to this entire family.

10          I lost my father and my brother when I was a child,

11     and Michael coming into the world was the only male in this

12     family.  He was cherished and adored.  He always has been.  He

13     always will be.

14          He made a very, very bad mistake earlier this year, a

15     huge error of judgment, but he was under the culmin [sic] of

16     influences of years and years of undiagnosed medical problems.

17     And it breaks my heart to see him in this environment.

18          He always showed such promise, such caring,

19     compassion for the world and the people in it.  And he has so

20     many people back in England who know that this is not the true

21     Michael.  That this is just something terrible that has

22     happened to him.

23          Everybody knows he's a good person at heart, and he

24     needs to come and get psychiatric care back home and be

25     rehabilitated by the supportive people who care about him.

1  He's very remorseful for what he did, not only that day but for

2  the effects it's had on the family.  And he just desperately,

3  desperately needs us, and we need him to draw a line under this

4  and to make sure he gets the care and the support and the

5  medication he needs to rebuild his life from here.

6              THE COURT:  All right.

7              MRS. SANDFORD:  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you.  And your written

9  statement, unless there's an objection, I'll make that a part

10 of the record as well.

11             MS. WEKSLER:  Thank you, Your Honor.

12             THE COURT:  And I left it on my desk, David, but I'll

13 bring it out right after.

14             All right.  If you would, you all come back forward,

15 please.

16             MS. WEKSLER:  Judge, I do have one more thing --

17             THE COURT:  Sure.

18             MS. WEKSLER:  -- I wanted to show the Court.  And I

19 neglected to show this to counsel, if I could have one moment.

20             THE COURT:  Sure.

21        (Showing document to Mr. Schiess.)

22             MS. WEKSLER:  So, Judge, I think this is really sort

23 of telling of truly who Michael is.

24             During the years that I have been practicing here, I

25 have gotten plenty of thank you cards from clients of mine.

1    But I think this sort of shows you at heart who Michael truly

2    is.  He's very much a child.  Not only is he young, as far as

3    age -- he's only 20 -- but I think that maturity-wise, he's

4    just much, much younger.  And I just wanted to offer the Court

5    this handwritten note that he made for me, which I think

6    exemplifies who he is.

7                THE COURT:  Do you want me to make this a part of the

8    record, or I can have it photocopied and make the photocopy.

9                MS. WEKSLER:  Okay.  I would like it back.

10                THE COURT:  Yes.  Yeah, that's -- make that -- just

11    photocopy that, and we will return that to you.

12                MS. WEKSLER:  Thank you, Judge.

13                THE COURT:  Yes.  All right.  Anything else?

14                All right.  All right.  Having heard the statements

15    of counsel for the government, counsel for the defendant, and

16    the defendant's remarks, and having reviewed the entire record,

17    the presentence report submitted by probation department,

18    considering its contents and the contents of the plea

19    agreement, the Court hereby accepts the terms of the plea

20    agreement and will embody those terms in the sentence provided.

21                Of course overriding everything are the factors set

22    forth in 18, USC, Section 3553(a) when determining an

23    appropriate sentence.

24                Some people have -- we see the ads on TV for the

25    various medications.  They need, oh, the purple pill, Nexium,

1  and that's something they have to take for the rest of their

2  life, because they have a physical problem, a medical problem,

3  acid reflux.

4          And you see ads for other things.  You know, the --

5  for the Crestor or Lip- -- what is it?  Lipitor?  Because they

6  need -- they've got high cholesterol.  You have a medical

7  problem.  You understand?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  There's nothing to be ashamed of or

10  embarrassed about.  You just have a problem.  You need

11  medication.  And but you're like a lot of other people that

12  need medication to function.  You understand?

13          THE DEFENDANT:  Yes, Your Honor.  I do.

14          THE COURT:  And that's all.  So it's important that

15  you stay on -- that you stay on that medication and not fall

16  into the same -- because what -- what is waiting for you is the

17  trap, and you see what a trap it is.  You know, if you get off

18  the medication, it's -- you know, it's a downward, downward

19  spiral.  So you need to -- for the rest of your life or until

20  the doctors say you don't need it, but that's something that

21  you need to address.

22          But I -- I think you are not a harden criminal.  I

23  don't see the -- you know, an evil -- you're a sociopath, like

24  a lot of people we have.  And you're willing to address your --

25  the main thing is you've addressed your mental health issues,

1    and you've expressed a willingness to continue.  I want to

2    encourage you to do that, because if you are off the

3    medication, it's just like, you know, cholesterol medication.

4    You put your health in danger, and you put your life in danger,

5    and you're going to be doing, you know, goofy, crazy stuff,

6    which is what I think this was.

7              I don't think this was a serious attempt.  And by

8    that I mean I don't think you had -- you harbored malice in

9    your heart and you wanted to kill anybody.  This was just some

10   crazy stunt or whatever, that -- that your mind told you to do,

11   but it was just that.  It was just something that was totally

12   out of character for you.

13             So I want to encourage you to keep on doing what you

14   are doing.  Stay on the medication and keep going.  But I think

15   the appropriate sentence is 12 months and a day.  And I think

16   probation's -- that's been a complete report, and I think

17   that's appropriate.

18             THE DEFENDANT:  Thank you, Your Honor.

19             THE COURT:  And then there may be time off.  And I

20   wasn't thinking of the time off for time -- for time served,

21   but -- or the credit for time served, but I think that's

22   appropriate.

23             Your family is waiting for you.  You want to get back

24   to England, and, you know, it's just important that for the

25   rest of your life, you keep up the treatment.  All right?

1         THE DEFENDANT:  Yes, Your Honor.  Thank you.

2         THE COURT:  But you're not -- I don't think you're an

3   evil person or someone "We need to incarcerate you.  We need to

4   lock you up."  It's just I think the medication addresses your

5   problems, and now you can go on and be productive.

6         THE DEFENDANT:  Thank you, Your Honor.

7         THE COURT:  Yes, sir.  So I just want to encourage

8   you to stay in that frame of mind.

9         So you are hereby committed to the Bureau of Prisons

10  for a term of 12 months and one day.  And I think probation's

11  appropriately identified a downward variance with reasonable

12  conditions, because it will hold you accountable for your

13  behavior.

14        It will hold you accountable for your behavior and

15  still promote a deterrence of future criminal conduct and

16  continue to protect the public from further crimes of

17  Mr. Sandford.  I think he does appreciate the gravity of his

18  circumstances and hopefully can learn from this experience.

19        So that sentence is not within the guideline range,

20  but it's a downward variance for the reasons that I have set

21  forth.

22        A mandatory penalty assessment of $100 is required by

23  statute and due immediately.  Restitution does not apply in the

24  case.  And due to the defendant's financial situation, the fine

25  is being waived.

1        Supervised release will be imposed for a term of

2   three years to run concurrently on Counts Two and Three.

3        While on supervised release, the defendant shall

4   comply with the standard conditions of supervision recommended

5   by the sentencing commission and the following mandatory

6   conditions required by statute.

7        One, number one, you must not commit another federal,

8   state, or local crime.

9        Number two, you must not unlawfully possess a

10  controlled substance.

11       Number three, you must refrain from any unlawful use

12  of a controlled substance.  And probation has recommended that

13  we suspend that, so I won't impose number three, the drug

14  treatment.  I don't think you need drug treatment.  I think

15  mental health treatment is appropriate.

16       THE DEFENDANT:  Thank you, Your Honor.

17       THE COURT:  So we'll address that, but I'm going to

18  suspend that then.

19       You must -- number three then, you must cooperate in

20  the collection of DNA as directed by the probation officer.

21       In addition, the following special conditions are

22  imposed.  And this is probably the most important one.

23       Number one, mental health treatment.  You shall

24  participate in and successfully complete a mental health

25  treatment program, which may include testing, evaluation,

1  and/or outpatient counseling as approved and directed by the

2  probation officer.

3        You shall refrain from the use and possession of

4  beer, wine, liquor and other forms of intoxicants while

5  participating in mental health treatment.  Further, you shall

6  be required to contribute to the cost of services for such

7  treatment as approved and directed by the probation officer

8  based upon your ability to pay.

9        Number two, deportation compliance.  If deported, you

10  shall not reenter the United States without legal

11  authorization.

12        Number three, warrantless search.  You shall submit

13  to the search of your person, property, residence, place

14  business, and automobile under your control to a search

15  conducted by a United States probation officer, at a reasonable

16  time and in a reasonable manner, without a search warrant, but

17  based upon reasonable suspicion of contraband or evidence of a

18  violation of a condition of supervision.

19        Failure to submit to a search may be grounds for

20  revocation of supervision.  And the defendant shall inform any

21  other occupant that the premises are subject to a search

22  pursuant to this condition.

23        All right.  And Mr. Blevins, do you have a copy of

24  those conditions?  If you'd present that in open court to the

25  defendant and he may study them as he sees fit.

1       In your plea agreement, you waived your rights to

2   appeal your conviction and sentence.  Nevertheless, there may

3   be certain appellate rights that cannot be waived.

4       If you do desire to appeal your conviction and

5   sentence, you must file notice of appeal with this Court within

6   14 days from today's date.

7       In the event you cannot afford to pay the costs on

8   appeal, you may request permission to proceed in forma

9   pauperis.

10       If you require the services of an attorney to assist

11   you on the appeal and cannot afford to pay an attorney, one

12   will be appointed to represent you at no cost to yourself but

13   at government expense.

14       And if you require any transcripts of any proceedings

15   in order to prosecute your appeal and cannot afford to pay for

16   those transcripts, they also will be provided at government

17   expense.  Do you understand all of that?

18       THE DEFENDANT:  Yes, Your Honor.  Thank you.

19       THE COURT:  All right.  Anything else to come before

20   the Court then?

21       MS. WEKSLER:  One last matter.  We submitted a motion

22   to Judge Ferenbach.

23       THE COURT:  There's a motion for visitation.  Now,

24   that's up to the marshals.

25       MS. WEKSLER:  And, Judge, if I may.  I have spoken to

1  Steven Carpenter who is usually the one that we deal with for

2  these types of purposes.  His family was allowed to visit with

3  him at the marshal's office prior to him entering his plea of

4  guilty.  And Mr. Carpenter related to us that there would be no

5  problem with that happening.  So we just don't have a court

6  order, but if the Court could allow that to happen, his family

7  is here.

8           THE COURT:  And I would order that to happen.  But

9  understand what I'm really doing is deferring to the marshals,

10 because we've had them before.

11          And frankly, it's heartrending sometimes in

12 sentencing somebody to 10 years, and the mother says, "Could I

13 at least give him a hug good-bye?"

14          "Nope.  Can't do it."

15          MS. WEKSLER:  No, and I understand, Judge.  I mean --

16          THE COURT:  No personal contact.  So understand it's

17 nothing personal or vindictive, but it's simply a security

18 concern of the marshals.  So if the marshals will allow it,

19 then I order that he have that.

20          MS. WEKSLER:  We appreciate that, Judge.

21          THE COURT:  Now, recommendation as to -- any request

22 for a recommendation?

23          MS. WEKSLER:  No, Judge.  A place that would just

24 accommodate his mental health needs.

25          THE COURT:  Okay.  So that would be number one, where

1   he can get his mental health issues -- continue to get them

2   treated.  That's the most important thing.

3           All right?  Mr. Schiess, do you have something more?

4           MR. SCHIESS:  Yes, Your Honor.  We'd move to dismiss

5   Count One of the indictment.

6           THE COURT:  And that will be the order of the Court

7   then.

8           Anything else to come before the Court?

9           MR. SCHIESS:  No, sir.  Thank you.

10          THE COURT:  Yes.  Thank you.

11          MS. WEKSLER:  Thank you, Judge.

12          THE COURT:  Thank you.  We'll be in recess.

13          THE DEFENDANT:  Thank you, Your Honor.  Thank you.

14          THE COURT:  Yes, sir.  Good luck, sir.

15          THE DEFENDANT:  Thank you.

16       (Recess, 10:31 a.m.)

17

18

19

20

21

22

23

24

25

1

2                                    --oOo--

3                       COURT REPORTER'S CERTIFICATE

4

5       I, KATHERINE EISMANN, Official Court Reporter, United

6  States District Court, District of Nevada, Las Vegas, Nevada,

7  certify that the foregoing is a correct transcript from the

8  record of proceedings in the above-entitled matter.

9

10 Date:  December 22, 2016.

11                          /s/ **_Katherine Eismann_**

12                          Katherine Eismann, CSR CRR RDR

13

14

15

16

17

18

19

20

21

22

23

24

25